In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-2678 & 06-2893

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

CHRISTOPHER MILLET,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 81-1—**James B. Moran**, *Judge.*

ARGUED MAY 22, 2007—DECIDED DECEMBER 14, 2007

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. In August 2004, Harvey Gooden, a police informant, invited an attorney, Christopher Millet, to participate in a robbery of a drug dealer. Millet, who claimed to be well versed in the art of robbing drug dealers, readily accepted Gooden's offer. After the robbery, Gooden asked Millet for a gun, purportedly to protect himself from the dealer they had robbed, and after some prodding, Millet obliged. For his actions, Millet was charged with conspiracy to distribute cocaine, at-

tempting to distribute a controlled substance, and knowingly disposing of a firearm to a known felon. The jury returned a conviction on the drug distribution counts, finding that the offenses involved over 500 grams of cocaine; however, Millet was acquitted on the firearm charge.

Millet appeals the district court's refusal to provide an entrapment instruction on the drug distribution counts, contending that there was insufficient evidence to show that he intended to join a conspiracy to steal drugs (in addition to cash) or that he conspired with anyone other than Gooden. Millet has failed, however, to demonstrate a lack of predisposition to commit the charged crimes, so he was not entitled to an entrapment instruction, and the evidence was sufficient to show that Millet and his co-conspirators expected to recover drugs during the robbery and to give those drugs to a known dealer. Millet also contests the district court's assignment of a four-level enhancement for his role in the offense, the court's denial of safety-valve relief, and the adequacy of the court's explanation for its within-Guidelines sentence. The record is clear that Millet was a leader of a conspiracy having five or more participants so he was not eligible for safety-valve relief, and the role enhancement was proper. The court also gave an adequate statement of reasons for its within-Guidelines sentence.

Finally, the government cross-appeals, claiming the court erred in failing to sentence Millet based on the total quantity of fake drugs stolen from the fictitious dealer. This argument has merit because the district court did not make an independent factual determination as to the amount of drugs Millet conspired to steal. Thus, we affirm in part and reverse in part the judgment of the district court, and remand for re-sentencing.

## I.  BACKGROUND

After more than a decade of sobriety during which he obtained a law degree, Christopher Millet relapsed in 2003 and again became addicted to heroin. That year, Millet met and began purchasing heroin and cocaine from Harvey Gooden. In August 2003, Gooden was arrested by Chicago Police. After that arrest led to federal firearms and drug distribution charges, Gooden agreed to cooperate with investigations by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI") to obtain a reduced sentence. In his role as informant, Gooden told federal authorities of Millet's illegal activities.

On June 29, 2004, Gooden told FBI Agent Patrick Smith that Millet engaged in a scheme to rob drug dealers of cash. Gooden claimed that Millet had contacts capable of identifying the bagmen of dealers, knew police officers who could perpetrate the robberies under color of law, and invited Gooden to join the scheme. On one occasion, Millet asked Gooden's help in robbing a participant in an earlier robbery of a drug dealer. Millet offered Gooden $5000 if he could locate a security specialist to deactivate the target's home alarm system. In his account of Millet's activities, Gooden never accused Millet of selling drugs or robbing dealers of drugs.

When the FBI decided to launch an operation centered on Millet, Gooden agreed to be the inside man. On August 3, 2004, Gooden, while wearing an audio recording device, told Millet that a Mexican drug dealer would be coming to Chicago to sell twenty kilograms of cocaine and two hundred pounds of marijuana. Gooden said he intended to buy two kilograms of cocaine, which he called "birds," for $13,000 a piece. Gooden remarked that a kilogram of cocaine would sell for $18,000 to $20,000 in Chicago. Millet agreed, "Right, 20 at least." Gooden again mentioned the

amount of drugs the dealer would have and said "I wanna take it." He then invited Millet to participate, saying "we can go in up there . . . ," but vowed to "sting 'em regardless," meaning with or without Millet's help. At that point, Millet interjected the idea of using police in the rip off, affirming that the "Harvey Police [could] do it." Several minutes later, Gooden brought the heist up again, emphasizing that he needed a gun, not Millet's participation in the robbery.

GOODEN: Hey . . . if you don't want no parts of it only thing I probably need from you . . .

MILLET: Oh, I do want some part . . .

GOODEN: Only thing I probably need from you is a sword, a gat.

MILLET: Huh?

GOODEN: All I need from you probably is a missel [sic] the only thing I probably need is a missel [sic] I got two . . .

MILLET: I give you one of them [unintelligible] swords [unintelligible].

GOODEN: I'm a throw you somethin' Joe.

MILLET: Fuck is you talkin' about . . .

GOODEN: Only thing, if you want some part I'm sayin' if you want some part of it though you welcome.

MILLET: Yeah, I want some parts of it.

Millet proceeded to explain how he wished to carry out the robbery. He said, he wanted to "go in proper," meaning with police, and he agreed to contact his "people" before his next conversation with Gooden. So, by the end of that

first conversation, Millet had unequivocally agreed to participate in the robbery but not to provide Gooden a gun.

The next day, Gooden informed Millet that the dealer had arrived in Chicago and would be in town for four days. Millet said he had just gotten off the phone with his contact and that his folks were on "standby." Gooden said they would do the robbery the next day unless Millet needed more time. Millet said his guys were ready, "on standby," but then suggested that it would be better to wait.

> MILLET:    That be good, that be good for him to money up, you know.
>
> GOODEN:  Hell yeah, yeah that's what I'm saying.
>
> MILLET:    That's our thing, if he money up.
>
>  . . .
>
> GOODEN:  If he money up, you mean if he sell that shit, but look . . .
>
> MILLET:    Yeah, that be good.
>
> GOODEN:  If we hit it . . .
>
> MILLET:    Yeah, that be plenty. You know that be real success, you know. Like you'd be like, not, not the last customer, damn near the last.

Although Gooden agreed that it would be best to wait for the dealer to convert his drugs to cash, Gooden asked Millet about the obvious possibility that the dealer might still have drugs at the time of the robbery.

> GOODEN:  Like we hit him and he got a bird or two left. Shit I could, I could pop them . . .
>
> MILLET:    That's yours, that's yours. No, that's yours.

GOODEN:  Bet, man. I get that? I'm good. [unintelligble]

MILLET:  [Unintelligible] man we ain't finna to fuck with that like that man.

. . .

GOODEN:  In case it ain't all cash. You know there's going to be cash, you know what I'm saying.

MILLET:  Right, but I'm saying all that other shit, you know, that, that's your expertise, you know.

GOODEN:  Oh, okay. So I can get that then? Pop it will all . . .

MILLET:  Yeah man, you know.

With that, Millet agreed to include drugs in the take, and moments later, he recognized that the drugs would translate to cash.

MILLET:  I understand, you probably have to work that anyway, won't you?

GOODEN:  Yeah, work that, you kidding. I pop that . . .

MILLET:  Right.

. . .

GOODEN:  I can get 'em off for probably like, like 16.

MILLET:  Right.

GOODEN:  So that, that's money too.

MILLET:  Right, right, right. But still that's fast money.

On Thursday, August 5, Gooden called Millet to say that the second half of the dealer's shipment would arrive the next day, and that the dealer would not be leaving Chicago until the following Wednesday. Millet commented that the dealer would be a "cash cow." Gooden agreed, and he added that the dealer probably would not have "many" leftover kilograms of cocaine at the time of the robbery. Gooden said, "remember I want, I want, the uh, the uh, the girl," meaning cocaine. The callers were disconnected before Millet could respond. When Gooden and Millet spoke later that day at Millet's law office, they discussed the benefits of partnering with police in a robbery of dealers. Millet said, "It's always better to go with this lick man." He said, "I done did this both ways man," with and without police, "and [was] willing to do it both ways . . . ." But he and Gooden agreed, working with police minimized resistance. Millet then called his police contact, in Gooden's presence, to confirm that the robbery would take place Sunday or Monday because they were waiting on the second shipment. After the call, Millet told Gooden there would be a total of four conspirators (for a four-way split) and that Millet and the other two conspirators would complete the robbery.

The next recordings occurred on Monday, August 9, 2004, the day of the robbery. That morning, the government parked a gray Cadillac STS in the parking lot of the Chicago Park Hotel in Harvey, Illinois. Before parking the car, federal agents placed a duffel bag containing $20,000 in cash and two fake kilograms of cocaine in the trunk of the car. Gooden made four calls to Millet between 10:41 a.m. and 11:00 a.m. During those calls, Gooden conveyed that he had met the dealer in a Cadillac parked at the Chicago Park Hotel and that he saw the dealer throw a duffel bag into the trunk of the car and remove the cocaine that Gooden purchased from the trunk. He also said, "I saw, I saw, I saw a couple a birds in there,

I saw at least 2, 3 of 'em but I saw plenty of money though." At trial, Millet admitted that "bird" was slang for cocaine, but said Gooden's use of the word "slipped" passed him because he was interested in the money. Gooden also told Millet that, while sitting in the Cadillac, he cracked the passenger window to make it easier for his confederates to break into the car. When Gooden asked Millet his estimated time of arrival at the Cadillac, he learned that Millet was not with the individuals who would commit the robbery; Millet claims that he was on his way out of town.

During these initial calls, Gooden reiterated that he wanted any drugs recovered during the robbery. He told Millet he was parked in a nearby warehouse, where Millet could "pass [him] the work . . . ." This comment was met with an unintelligible response from Millet. Later, Gooden asked, "how am I going to get the things? . . . I'm talking about the, I'm talking about the, the things, the girls so I can pop 'em off. . . . I'm going to sell them just like that. I gotta sell, right." That too received an unintelligible response.

Gooden and Millet exchanged additional calls between 11 a.m. and 2 p.m. Often during the calls, Gooden warned that they might miss the chance to complete the robbery if they did not hurry. During one call, Gooden read the Cadillac's license plate number to Millet. At another point, after the other conspirators had arrived on the scene to conduct counter-surveillance, Millet called Gooden to ask about a maintenance worker in the vicinity of the car whose presence made the conspirators nervous. Just after noon, Gooden told Millet he was going to drive to get his cousin and brother so they could help him complete the theft. Before Gooden could take this ruse any further, Millet notified him that the conspirators had struck and that the drugs they recovered were fake. Gooden said that he had been sold real cocaine, to which

Millet replied, ". . . I'm glad yours is cool. I'm saying that other shit wasn't nothing but fake move." Gooden asked "how many of 'em was it?" Millet replied, "[t]hree," and confirmed "[t]here was three birds[.]"

The observations of federal agents conducting surveillance on August 9 correspond with the recorded conversations. Throughout the morning and early afternoon, agents saw two vehicles pull into the parking lot and park next to or near the target vehicle. At about 1:25 p.m., three men in a car pulled up next to the target automobile. One man exited the car, popped the trunk of the Cadillac, removed the duffel bag, and returned to the car, which quickly drove off.

In a recorded conversation on August 18, Gooden told Millet that the dealer and the dealer's Chicago associate believed Gooden was involved in the robbery. Gooden said that several days earlier the associate had threatened him and given him twenty-four hours to return the cash. Gooden then asked Millet's help to get a gun, saying "[a]ll I need is a sword big brother. Man, man . . . Help me." Millet agreed to give Gooden a gun. But even after doing so, Millet tried to convince Gooden that he might not need to use the gun. Millet explained that they could "send a message" to the associate by robbing him of whatever money remained. This, Millet said, would temper the bagman's desire to hurt Gooden. On August 23, Gooden, accompanied by an undercover ATF agent posing as his girlfriend, went to Millet's home and retrieved a shotgun that Millet supplied to Gooden for protection.

Millet was arrested on October 26, 2004. After speaking with an attorney, Millet signed a cooperation agreement and agreed to discuss the attempted robbery with FBI Special Agent David Twohig. Millet's conversation with Twohig was not recorded, but two of Millet's attorneys were present during the meeting. According to Twohig,

Millet made the following statements during the meeting. He said "the main focus of the robbery was going to be the recovery of money from drug proceeds," and that "any drugs that were going to be recovered were to be given to Mr. Gooden." Millet also reportedly said that he knew "there was going to be a duffel bag with money and drugs stored in the vehicle." Finally, Twohig said Millet identified his police contact as Melvin Jones.

Millet and Jones were named in a superseding indictment. The indictment charged Millet with: (1) conspiring to possess with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; (2) attempting to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846; and (3) knowingly disposing of a firearm to a known felon in violation of 18 U.S.C. § 922(d). During a five-day trial, the jury heard the recordings detailed above, Agent Twohig testified to Millet's confession, and Millet offered his version of events. Millet explained that he and Gooden were under the influence of drugs during many of the recorded conversations. He admitted that he was willing to rob drug dealers of cash because dealers had profited from his addiction. But he vigorously denied any intent to rob the fictitious dealer of drugs. Millet said that he did not remember Gooden telling him there was cocaine in the trunk of the Cadillac and that he never heard Gooden ask for the drugs found in the duffel bag. When confronted with his statements regarding the number of fake kilograms of cocaine, Millet offered an implausible explanation. Millet testified that he meant to indicate that three men drove up beside the Cadillac to carry out the robbery, not that there were three fake kilograms of cocaine. Millet also acknowledged that on the day of his arrest, Agent Twohig treated him well. Finally, he admitted to answering some questions, but denied ever saying that any cocaine recovered during the robbery would go to Gooden.

During the jury instructions conference, Millet proposed an entrapment instruction on all three counts, but the district court only gave the instruction as to the third, saying the evidence did not justify giving the instruction on the drug distribution counts. The jury convicted Millet on Counts One and Two, and acquitted him on Count Three. He moved for a new trial, and that request was denied.

At sentencing, the government argued that Millet should be sentenced based on a drug amount between two and 3.5 kilograms. The court instead settled on a drug quantity of between 500 grams and two kilograms. The court imposed a four-level role in the offense enhancement, denied Millet's request for safety-valve relief, and did not impose an enhancement for obstruction of justice. The court refused Millet's request for a below-Guidelines sentence and settled on a 97 month sentence, which fell at the bottom of the Guidelines range. Millet now appeals the denial of his request for an entrapment instruction, his convictions, and his sentence. The government cross appeals, asserting that the district court erred in calculating the amount of drugs involved in the crime.

## II.  ANALYSIS

### A.  The District Court Did Not Err in Refusing to Provide an Entrapment Instruction on Counts One and Two

Millet contends the district court erred in refusing to give an entrapment instruction on Counts One and Two. We review the district court's decision de novo. *United States v. Al-Shahin*, 474 F.3d 941, 947 (7th Cir. 2007). A defendant is entitled to an instruction on his theory of defense if: (1) the instruction provides a correct statement of the law; (2) the theory of defense is supported

by the evidence; (3) the theory of the defense is not part of the government's charge; and (4) the failure to include the instruction would deprive the defendant of a fair trial. *Id.* The defendant was not entitled to an entrapment instruction on Counts One and Two because he failed to show that his defense theory was supported by the evidence.

When claiming entrapment, a defendant must proffer evidence in support of both of the elements of entrapment: lack of predisposition on the part of the defendant to engage in criminal conduct and government inducement of the crime. *See United States v. Haddad*, 462 F.3d 783, 789-90 (7th Cir. 2006). If the evidence shows predisposition, we may reject the entrapment defense without considering whether the defendant was induced. *United States v. Bek*, 493 F.3d 790, 800 (7th Cir. 2007).

### 1.  Millet Was Predisposed to Commit the Acts Charged in Counts One and Two

In assessing whether a defendant was predisposed to commit the charged offense, we consider the following factors:

> (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999). We begin with the fourth factor, which we have declared to be the most important in our assessment. *See id.*

Millet contends he was reluctant to include the theft of drugs in the robbery scheme, but the record suggests otherwise. From day one, Millet showed a willingness to join a conspiracy that might include the stealing of drugs. During Gooden and Millet's first conversation about the robbery, Gooden said the dealer would have "20 [kilograms of cocaine] and 200 pounds [of] weed" and stated, "I wanna take it." Gooden did not specify whether "it" referred to drugs or money. But "it" was most likely a reference to the dealer's inventory, which had been the topic of conversation up to that point. Without elaborating on his intentions, Gooden invited, but did not pressure, Millet to participate. In fact, Gooden said he would "sting 'em regardless," and told Millet "if you don't want no parts of it only thing I probably need from you . . . is a sword, a gat." Millet jumped at the opportunity, despite the possibility that the heist would target drugs, saying "Yeah, I want some parts of it."

In subsequent conversations, Millet expressed a preference for money over drugs. He wanted to wait to commit the robbery until the dealer had an opportunity to "money up" and disclaimed any personal interest in the drugs, saying "That's yours, that's yours. No that's yours," "we ain't finna fuck with that like that man," and "all that other shit, you know . . . that's your expertise." So Millet had no personal interest in selling drugs, but was undisturbed by the notion that Gooden might include drugs in his take. When Gooden asked if he could steal drugs, Millet said, "Yeah man, you know," and "that's money too." The record does not suggest even an initial reluctance, which is itself insufficient to show a lack of predisposition, *see United States v. Brown*, 136 F.3d 1176, 1185 (7th Cir. 1998). Millet has failed to show a reluctance to commit the offense that was overcome only by government persuasion.

The record also belies Millet's argument that the government offered some extraordinary benefit sufficient to

overcome an innocent person's resistance to committing the crime. Millet suggests that we find inducement based on the fact that the government introduced drugs into the scheme, applied constant pressure on him to complete the crime, and dangled huge profits in front of him. But, on these facts, the government's actions did not constitute extraordinary inducement.

The mere fact that the government crafted a scheme, which included drugs, is not sufficient. *See United States v. Higham*, 98 F.3d 285, 290-91 (7th Cir. 1996); *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995). The government did not place any exceptional amount of pressure on Millet. Rather, from the outset, Gooden communicated that Millet was welcome to participate but that he did not have to do so. It was Millet who willingly joined the conspiracy when he said, "Yeah, I want some parts of it." Moreover, "the government's persistence in attempting to set up a drug transaction is not alone sufficient to carry the case beyond an ordinary opportunity." *United States v. Santiago-Godinez*, 12 F.3d 722, 729 (7th Cir. 1993); *United States v. Casanova*, 970 F.2d 371, 376 (7th Cir. 1992).

Finally, Millet contends that the government's inducement was extraordinary because the government suggested that he could make huge profits from the robbery. Given the large quantity of drugs the fictitious dealer was said to possess, the heist could conceivably net several hundred thousand dollars. Still, this case stands in stark contrast to the classic example of extraordinary inducement, i.e., where "the police offered a derelict $100,000 to commit a minor crime that he wouldn't have dreamed of committing for the usual gain that such a crime could be expected to yield, and he accepted the offer and committed the crime . . . ." *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). Millet was a lawyer (albeit one struggling with a serious addiction), not a derelict, and his offense

was no minor offense that any law abiding citizen would commit if only given the right financial incentive.

Moreover, the huge profits do not appear to explain Millet's participation in the criminal endeavor. First, Millet admits that he committed robberies of cash in the past for smaller sums of money. So he cannot say that he would only rob a dealer of cash if an extraordinary gain could be had. The extraordinary sums also fail to explain his basis for including the theft of drugs in the conspiracy. Given that Millet wanted to wait until the dealer had converted most of his drugs into cash and appears not to have expected to reap any profit from the theft of the drugs, he did not agree to Gooden's request to rob the dealer of his drugs in anticipation of reaping extraordinary gains. *See United States v. Mahkimetas*, 991 F.2d 379, 386 (7th Cir. 1993) ("[t]o show improper inducement, a defendant must put forth evidence showing that he would not have committed the crime had the particular attraction or lure that the government held out not existed" (internal quotation marks and citations omitted)). This is particularly true since Gooden did not threaten to exclude Millet from the scheme if drugs were not included in the take. The remaining factors do little, if anything, to help Millet carry his burden.

Millet next contends that he did not have the character to commit the crimes charged in Counts One and Two. We cannot be so sure. Millet readily admitted a willingness to profit from drug sales, if not to sell drugs himself. He had stolen drug money in the past, at times with the assistance of corrupt officers. And he called a drug dealer his friend. Millet did not manifest the character of one who would reject outright the notion of placing drugs in the hands of a dealer. Clearly, "the record discloses a less than law abiding background." *Casanova*, 970 F.2d at 375.

Millet's criminal predisposition is further supported by the fact that he is the one who introduced the idea of

robbing drug dealers. While Gooden was the first to suggest robbing a specific dealer (one who did not exist), Millet had previously introduced the broad idea of stealing from dealers, had robbed dealers in the past, and asked Gooden's assistance in doing so. That Gooden suggested a particular dealer and asked permission to do the obvious, steal drugs from a drug dealer, does little to advance Millet's lack of predisposition argument.

Finally, Millet expected to profit from the conspiracy, if not from the sale of drugs. Although Millet did not expect to gain from the conspiracy's secondary purpose—the recovery of drugs—he certainly joined the overall conspiracy with the expectation of making a profit.

In sum, because Millet has failed to show that he lacked the predisposition to commit the crimes charged in Counts One and Two, the district court did not err in refusing to give an entrapment instruction on those counts.

## B.  The Evidence Was Sufficient to Support Millet's Convictions

Next, Millet argues that there was insufficient evidence to support his convictions. In making such an argument, Millet faces a steep hurdle. *Bek*, 493 F.3d at 798. "Considering the great deference owed to the jury's verdict, we will view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004) (quoting *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001)).

First, Millet argues that he never agreed that the robbery would target drugs. There was ample evidence to the contrary. At Gooden's request, Millet agreed to ad-

just the terms of the conspiracy to include the theft of drugs. The fact that he wanted the dealer to "money up" and become a "cash cow" is not inconsistent with the view that the conspiracy would also target drugs. Indeed, Agent Twohig testified that Millet told him money was the "main focus" of the robbery, but also that any drugs recovered would be turned over to Gooden.

Second, Millet contends that he did not know that the duffel bag contained drugs. This argument is also unpersuasive. Since Gooden relayed to Millet that the drugs he purchased were pulled from the trunk of the car, Millet could have reasonably foreseen that the duffel bag contained both money and drugs, and the jurors heard testimony that Millet admitted knowing that the bag contained both money and drugs.

Finally, Millet says that there is no evidence that he conspired to steal drugs with anyone other than police informant Gooden (and one cannot conspire with a police informant, *see United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001)). Millet notes that he and Gooden were the only persons to engage in recorded conversations about stealing drugs. This, he says, prevented the government from showing that other members of the conspiracy intended to engage in a conspiracy to steal and distribute drugs. However, this argument fails because there was sufficient evidence for a jury to infer that Millet's actual co-conspirators (the crooked police officer and others) shared his intent to steal drugs and give them to a known dealer. Specifically, since Millet did not take part in the robbery, he had to tell others to steal money and drugs to ensure that both would be taken. Additionally, given that the conspirators knew they were robbing a drug dealer, they could have reasonably foreseen that drugs would be present in the duffel bag. A jury could have reasonably inferred that the persons to execute the robbery knew and adopted Millet's intent to steal drugs.

**C. The District Court Did Not Err in Giving the Role in the Offense Enhancement or Denying the Safety Valve Reduction**

Millet takes issue with the district court's assignment of a four-level role in the offense enhancement. Such an enhancement may be given if the defendant was a leader in the offense and the offense involved at least five persons or was otherwise extensive. *See* United States Sentencing Commission Guidelines Manual ("U.S.S.G.") § 3B1.1(a). These factual questions are reviewed for clear error. *See United States v. Hernandez*, 330 F.3d 964, 990 (7th Cir. 2003). Under this standard, we will only reverse if left with a definite and firm conviction that a mistake has been made. *United States v. Marty*, 450 F.3d 687, 689-90 (7th Cir. 2006).

Millet contends that Gooden was the leader in the offense and that he was not.[1] We disagree. In deciding whether to apply the enhancement, courts consider:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, App. Note 4.

These factors point to Millet as a leader in the offense. Millet certainly exercised decision-making authority. From day one, he told Gooden that he wanted to be involved,

---

[1]  Millet seems to suggest that there can be only one leader in an offense but that is not the case. *See* U.S.S.G. § 3B1.1, App. Note 4.

structured the robbery to include police officers, and recruited the other participants. Gooden even pretended to drop some people from the conspiracy in order to incorporate Millet's contacts. Millet made the decision that the robbery should be delayed until the dealer could "money up." He was the conduit of information between Gooden and Jones, and those two individuals sat on the margins. Indeed, Millet even notes in his brief that "Gooden operated at the periphery of the conspiracy." Opening Br. of Defendant-Appellant at 37. We can tell that Gooden came to view Millet as a leader in that Gooden asked Millet's permission to take drugs during the robbery.

Also, the district court did not err in finding that the conspiracy involved at least five individuals: Millet, the corrupt police officer, and the three individuals in the car that sped off with the duffel bag. All of those individuals were participants in the conspiracy, meaning they were "criminally responsible for the commission of the offense," U.S.S.G. § 3B1.1, App. Note 1, because they gave "knowing aid in some part of the criminal enterprise." *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996). During the robbery, one grabbed the bag, another acted as a getaway driver, and the court reasonably believed that the final person acted as a lookout or protection.

Because the defendant had a leadership role in the offense, the district court properly denied his request for a reduction under U.S.S.G § 5C1.2, the safety-valve provision, which grants defendants relief from statutory mandatory minimum sentences. A leader or organizer of criminal activity is disqualified from receiving that benefit. U.S.S.G. § 5C1.2(a)(4).

**D. The District Court Did Not Err in Addressing Millet's Arguments for a Non-Guidelines Sentence**

Millet contends that the district court did not consider the 18 U.S.C. § 3553(a) factors when arriving at a sentence. We evaluate a claim that a district court has failed to comply with the sentencing procedures in place after *United States v. Booker*, 543 U.S. 220 (2005), under a non-deferential standard of review. *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005).

After *Booker*, a sentencing court must: (1) calculate the applicable Guidelines range; (2) give the defendant an opportunity to identify any of the 18 U.S.C. § 3553(a) factors that might warrant a non-Guidelines sentence; and (3) state which factors influenced the final sentence. *Id.* at 1047. The district court satisfied each of these requirements. First, the district court considered each party's argument regarding adjustments for a firearm, a leadership role, acceptance of responsibility, and obstruction of justice. The court also addressed the defendant's motion for a downward departure based on impairments caused by his Interferon treatments for Hepatitis C, familial circumstances, and depression, and rightly concluded that these conditions were not grounds for a departure. *See* U.S.S.G. §§ 5H1.3, 5H1.4, 5H1.6. The district court arrived at an offense level of thirty and a criminal history category of a Guidelines range of 97 to 121 months.

The court then allowed both parties to argue for a particular sentence. The government asked for a Guidelines sentence, emphasizing that the defendant had violated his duties as an officer of the court and had not shown remorse. The defendant argued for a below-Guidelines sentence, reminding the court of his familial circumstances and pointing out that the court could consider the

health implications of Interferon treatments under § 3553(a). The court listened to both sides and imposed a ninety-seven month sentence, which fell at the bottom of the guideline range. It is evident that the court considered several of the § 3553(a) factors in arriving at his sentence. The court addressed the defendant's history and characteristics, referencing Millet's "tough beginnings," his failure to live up to his role as an officer of the court, and his claims to have committed armed robbery in the past. *See* § 3553(a)(1). The court evaluated the seriousness of the offense, noting that the case involved a member of the bar prepared to engage in armed robbery. *See* § 3553(a)(2). By recommending substance abuse treatment during and after Millet's incarceration, the court crafted a sentence to address the defendant's particular treatment needs. *See* § 3553(a)(2)(D). In settling on a sentence within the Guidelines range, the court necessarily took the Guidelines into account. *See* § 3553(a)(4). Additionally, as explained below, the court addressed Millet's concerns regarding sentencing manipulation in arriving at a drug amount for sentencing purposes. Although the defendant might have liked the court to address each of his arguments for a below-Guidelines sentence in detail and list each § 3553(a) factor bearing on the sentencing determination, the court was not required to do so. *See Rodriguez-Alvarez*, 425 F.3d at 1047; *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005); *United States v. George*, 403 F.3d 470, 472-73 (7th Cir. 2005). The district court gave an adequate statement of reasons for the sentence.

**E. The District Court Should Have Made an Independent Factual Determination as to the Amount of Drugs Millet Conspired to Steal**

In its cross appeal, the government argues that the district court misapplied the Guidelines in not taking

into account the full weight of the fake drugs stolen from the trunk of the Cadillac. Specifically, the government finds fault with the district court's decision to accept the jury's determination of drug quantity because it was "troubled by the scenario in which the offense level is driven to a considerable extent by actions that the government takes in terms of deciding how many kilos to plant in the truck." The government suggests that under U.S.S.G. § 2D1.1, the district court was obligated to calculate Millet's offense level based on the total amount of cocaine that the defendant attempted or conspired to possess—the two kilograms of fake drugs actually taken from the automobile. We review the district court's interpretation of the Guidelines de novo and its finding of facts for clear error. *See United States v. Melendez*, 467 F.3d 606, 607 (7th Cir. 2006).

To begin, the Guidelines are sensitive to the very concerns expressed by the district court: "[I]n a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant." *See* U.S.S.G. § 2D1.1, App. Note 12. So it would not have been error to calculate Millet's Guideline range based on the amount of drugs that he and his co-conspirators agreed to steal. *See United States v. Burke*, 431 F.3d 883, 888 (5th Cir. 2005); *United States v. Samuels*, 308 F.3d 662, 670 (6th Cir. 2002); *United States v. Mankiewicz*, 122 F.3d 399, 402 (7th Cir. 1997). However, in determining Millet's offense level, the district court relied only on the jury's conclusion that Millet and his colleagues conspired to steal at least 500 grams. Neither the district court nor the jury made an independent determination of the quantity of drugs that Millet and his co-conspirators agreed to steal. *See* U.S.S.G. § 1B1.3, App. Note 2. A factual determination of drug quantity is needed to

calculate the defendant's offense level. *See United States v. Bokhari,* 430 F.3d 861, 864 (7th Cir. 2005) (stating that "it is the role of the district court . . . to make the initial factual findings necessary to support a sentencing calculation"). Therefore, we remand this case for the district court judge to make an independent determination as to drug quantity, and on remand, the district court may well issue the same sentence after first determining the drug quantity and appropriate sentence calculation under the advisory Guidelines scheme.

### III.  CONCLUSION

For the reasons detailed above, the judgment of the district court is affirmed in part and reversed in part. This case is REMANDED for re-sentencing.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*