In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3519, 11-3627, 12-1016, and 12-1290

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER BLITCH, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06-CR-586— **Harry D. Leinenweber**, *Judge.*

ARGUED OCTOBER 22, 2012— DECIDED DECEMBER 2, 2014

Before BAUER and ROVNER, *Circuit Judges*, and RANDA,
*District Judge.*[*]

RANDA, *District Judge.*  This case involves criminal charges
arising from a fictional drug stash house robbery. Christopher
Blitch, Michael Carwell, Devarl Washington and Michael
Harris were charged with conspiring and attempting to possess

[*] Of the Eastern District of Wisconsin, sitting by designation.

with the intent to distribute more than five kilograms of cocaine. The defendants were also charged with being felons in possession of firearms and carrying those firearms in further-ance of a crime. In 2007, a jury convicted the defendants on all counts, but on appeal, this court reversed and remanded for a new trial due to problems with jury selection and deliberation. *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010). On re-trial, the defendants were acquitted on the attempt charge but convicted on all other counts. Each defendant was sentenced to the statutory minimum of twenty-five years in prison.

In these consolidated appeals, two of the defendants, Carwell and Harris, argue that the district court erred by granting the government's motion *in limine* to preclude them from presenting an entrapment defense. The court disagrees, and the balance of the arguments presented on appeal are similarly without merit. Therefore, the defendants' convictions and sentences are affirmed.

## I.  Background

In 2006, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") developed a plan to recruit individuals to rob a fictional drug stash house. Special Agent David Gomez assumed the identity of "Loquito," a drug courier for a large Mexican drug cartel. According to the cover story, Loquito was unhappy with his employer and intended to rob a stash house operated by the cartel. To find Loquito's accomplices for the fictional robbery, the ATF procured the assistance of Jamison Moore, a paid informant. Previously, Moore entered into a plea

agreement in state court, wherein he agreed to assist in the arrest and indictment of ten different individuals on charges for delivering or possessing with the intent to deliver controlled substances. In July of 2006, Moore began recruiting people to join Loquito's crew in an effort to fulfill this quota. Thus began a series of recorded meetings between Moore, Agent Gomez, and some or all of the defendants.

On July 27, 2006, Moore, Agent Gomez, and an unindicted co-conspirator met with defendant Washington. Gomez told Washington that he was a courier for a Mexican drug cartel, and that he wanted to assemble a crew to steal cocaine from a cartel stash house. Gomez explained that he transported between ten and fifteen kilograms of cocaine at a time for the cartel, that roughly the day before he transported the cocaine he received a call from his boss who would tell him to be ready the next day, and that he never learned the location of the stash house until about an hour before he was supposed to pick up the drugs. Gomez further explained that once inside the stash house, he usually saw between fifteen and twenty-five kilograms of cocaine. Gomez also explained that he had seen "stacks and stacks" of money inside the house. Washington asked Gomez whether he had seen any "artillery" in the house, which Gomez understood to mean guns. Later in the conversation, Washington indicated that he was carrying a gun that day by pointing to his waistband and stating that he was "heated," and that he "stay[ed] heated."

Agent Gomez asked Washington what would happen if, during the robbery, one of the cartel guys inside the stash

house pulled out a "MAC," a type of assault rifle. Washington responded that everyone involved in the robbery would have guns. Later in the conversation, Washington said that once inside the stash house, "if I have to pull a trigger, or … if I hear a trigger … everybody gotta go! … If they didn't fuckin' come wit' us, they're stayin' there." Finally, Washington and Moore discussed how they would split fifteen kilograms of cocaine, leaving each person with three kilograms. Washington remarked, "If you can't make no'in' happen with that [three kilograms] then … ," which Gomez understood to be a reference to selling the three kilograms of cocaine.

On August 8, Agent Gomez met again with Moore, the unindicted co-conspirator, and Washington. Gomez repeated his earlier assertion that the stash house would probably contain at least fifteen kilograms of cocaine. During that conversation, Washington said, "When you, when you dealin' wit' a home invasion, robbery, armed violence, you know what to expect. Understand me? Then these are drug dealers. The[ir] first mind is not to call the police." Washington said he planned to cover his face during the robbery, explaining, "I don't never go naked." Washington also said they would have to tie up the people inside the house, and that his "main thing is not to have to play with no pistol unless we're fittin' to kill it."

At the same meeting, Moore discussed how he would "work on" getting defendant Harris to take part in the robbery. Moore said he wanted Harris to be involved, but he would not "waste no time wit' him and keep playin' wit' his ass … [H]e's

in or he's out. … If he don't want no money, then that's on him, man." Later, Moore said that if Harris and another man "don't [want to] do it, they don't want no part, then I'll just, we, we'll just push on from there," and added, "We ain't wastin' time with them, 'cause we don't got no time to waste."

On August 14, ATF agents monitored Moore as he made separate telephone calls to defendants Harris and Carwell, telling them that Agent Gomez (i.e., Loquito) was going to be in town later that day for a meeting. Moore also told Harris that one of the people who was going to be involved in the robbery was no longer available and asked whether Harris could find someone else to participate. Harris said he already had someone and was trying to get one more.

Later on August 14, Moore and Agent Gomez met with all four defendants. For the first part of the meeting, only Gomez, Moore, and Carwell were present. After Carwell got in the car with Gomez, and before Gomez explained the details of the robbery, Carwell said, "If there's any penitentiary charges, I hope it's worth it." Later, Carwell asked for details about who would be inside the stash house, explaining that he wanted to "know who I'm fuckin' with so I know how to prepare myself." Carwell asked Gomez about how much drugs they would be able to take from the stash house, and when Gomez said fifteen kilograms or more of cocaine, Carwell replied, "Damn!" In addition to the cocaine, Carwell speculated that they might also find "a couple hundred thousand dollars" in the stash house.

Eventually, all of the defendants arrived at the meeting, and Agent Gomez explained the robbery and that they could expect to get about fifteen kilograms from the stash house. Gomez told the defendants that he was hoping to get the call that night and that they would do the robbery the next day. Upon hearing the scenario, Harris asked how many people were inside the stash house and what type of "artillery" they had. Gomez responded that he had seen pistols, and Carwell concluded, "Everybody's strapped." Later in the conversation, Carwell said that the defendants would have to "repackage" the cocaine they stole.

The defendants discussed the best way to rob the stash house. Amongst themselves, Harris suggested that they should just rob Agent Gomez when he came out of the stash house with the drugs. In response, Washington said that if the defendants pursued that plan, they would only get five kilograms from Gomez instead of the full fifteen or more kilograms inside the house. Harris recognized the problem, asking "How the fuck is we gonn' get … all the shit if we ain't, if we don't go in the house?" Carwell said, "and if we goin' in, we gotta body."

The defendants also discussed whether they should go into the house immediately after Agent Gomez. Blitch said that as soon as Gomez entered the house the defendants should "rush up in" there. Harris added, "We goin' through windows and shit." Later, the defendants discussed whether they should wait for Gomez to go in the house and then come out and give

them information about who was in the house, so that Gomez could serve as the defendants' "eyes and ears."

Agent Gomez asked the defendants what would happen if one of the guys inside the house had a MAC. In response, Blitch said "he gettin' his ass chop the fuck up. Goddamn it. Shit. He gettin' chopped up." Harris then said, "Shit! We got a MAC." On three different occasions, Harris asked whether all the co-conspirators had "arsenal," "artillery," and "pistols."

In the presence of all the defendants, Agent Gomez told the defendants to let him know if they did not want to do the robbery, and that if so, Gomez would just "find another crew." None of the defendants opted out. To the contrary, Carwell responded, "You're fuckin' wit' a bunch o' wolves that's hungry, man." Near the end of the meeting, Gomez told the defendants that he was expecting a call soon and that the defendants should "be ready tomorrow." Washington replied, "We want this as bad as you do." Carwell said: "We all been waitin' on this for I don't know how many years."

Blitch, Harris and Washington eventually left the meeting, and Carwell remained in the car with Moore and Agent Gomez. Carwell said that if they split fifteen kilograms between six people, it would be two-and-a-half kilograms each. Carwell said he was "map[ping] out a whole mo'fuckin' plan," and that after the robbery he would wait for a period of time and then "flood the city" with his share of the cocaine. Explaining that he hoped this would be his "break," Carwell said his two-and-a-half kilograms amounted to "90 … Os," meaning

ninety ounces, which Carwell said he would sell "fi'ty hard" and "forty soft." Gomez understood this to mean that Carwell would sell fifty ounces in the form of crack cocaine and forty ounces in the form of powder cocaine. Carwell also said that he would sell his share of the cocaine in "dubs and dimes," which Gomez understood to mean $20 bags of cocaine containing 0.2 grams ("dubs") and $10 bags of cocaine 0.1 grams ("dimes"). Carwell said his plan to sell the cocaine would "feel motha-fuckin' beautiful."

The next day, ATF agents monitored Moore as he called each of the defendants and told them to meet at a McDonald's in Aurora that night and to be ready to do the robbery. Each defendant agreed.

That evening, Moore and Agent Gomez arrived at the McDonald's in a van. Shortly thereafter, Harris and Blitch arrived and parked next to the van. Gomez got out of the van and spoke with Harris and Blitch about the robbery, saying that Gomez could get the final call any minute. Harris told Gomez that he and Blitch wanted to stay in Blitch's car because it would be "better" to take more cars to the stash house. Gomez repeatedly tried to get Harris and Blitch to go in the van, because ATF's arrest plan called for all the defendants to get in the van so they could be arrested in one place. When Gomez told Harris and Blitch that if they remained in their own car it might get "burnt up," meaning detected by the police, Harris responded that they were going to be on foot when they approached the stash house.

Washington and Carwell arrived at the McDonald's, and Agent Gomez told the defendants that he was going to take them to a storage locker to show Moore where to put Gomez's share of the stolen cocaine after the defendants split it up. Washington and Carwell got into the van with Gomez and Moore, and Gomez drove the van to a nearby storage facility. Harris and Blitch followed in Blitch's car. During the drive, Washington and Carwell discussed how everyone involved in the robbery could expect to get 2.5 kilograms of cocaine for their efforts. When they arrived at the storage facility, Carwell said, "this is where we gonna split the shit up then, man."

At the storage facility, Agent Gomez punched in a code to open the wrought-iron gate that separated the storage lockers inside the storage facility from a parking lot outside the facility. Gomez drove the van through the gate and into the storage facility, but Harris and Blitch refused to drive past the gate. Noting that the gate would close behind them if they drove in, Harris said that he was "waiting on the safe side." Harris and Blitch parked their car in the parking lot outside the gate and waited for Gomez.

After Agent Gomez drove the van inside the storage facility, about three minutes passed before Gomez gave the arrest signal. ATF "flash bangs" went off, making a loud noise and emitting a powerful white light. An ATF special response team—akin to a SWAT team—emerged from the storage lockers, and law enforcement agents and officers descended on the van to arrest Carwell and Washington. Harris and Blitch tried to drive out of the parking lot, but nearby law enforce-

ment officers pulled their cars in front of Harris and Blitch's car, blocking their escape.

At the time of arrest, each defendant was armed with a loaded gun. Harris was carrying a .357 caliber revolver loaded with five rounds of ammunition. Blitch had a 9 mm pistol loaded with ten rounds of ammunition, which law enforcement found partially underneath the driver's seat where Blitch was sitting. Washington was carrying a .22 caliber pistol loaded with nine rounds of ammunition. Washington was also wearing a black hooded sweatshirt and was carrying twine, duct tape, and a black ski mask. Carwell was carrying a .25 caliber pistol loaded with seven rounds of ammunition, and was wearing batting gloves. A fifth loaded gun—a .380 caliber pistol loaded with three rounds of ammunition—was on the rear bench of the van.

## II. Entrapment

Entrapment involves "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553–54 (1992). Entrapment has two elements: government inducement of the crime and a lack of disposition on the part of the defendant. *United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011). The "most important function of the doctrine, the one that the Supreme Court has repeatedly affirmed, is to ensure that people who are not predisposed to commit a crime are not transformed into criminals by the government." *Id.* at

765 (citing *Sorrells v. United States*, 287 U.S. 435, 442 (1932) and *Sherman v. United States*, 356 U.S. 369, 372 (1958)).

Recently, and in the context of another fictional drug stash house case, this court had occasion to clarify its entrapment jurisprudence "both substantively and procedurally." *United States v. Mayfield*, No. 11-2439, 2014 WL 5861628, at *1 (7th Cir. Nov. 13, 2014) (*en banc*). Procedurally, the court explained that entrapment is generally a jury question, and the government must prove predisposition or the lack of government inducement beyond a reasonable doubt in order to defeat it. *Id.* at *21–22. Thus, the defendant is entitled to a jury instruction on the defense "'whenever there is sufficient evidence from which a reasonable jury could find entrapment.'" *Id.* at *22 (quoting *Mathews*, 485 U.S. at 62). However, the court also observed that entrapment is typically litigated before trial on the government's motion to preclude the defense, as it was here. This practice is "permissible," but it "carries an increased risk that the court will be tempted to balance the defendant's evidence against the government's, invading the province of the jury." *Id.* at *23. In this posture, courts must "accept the defendant's proffered evidence as true and not weigh the government's evidence against it." *Id.*

Harris and Carwell objected to the government's motion to preclude an entrapment defense, but neither of them proffered any evidence in support of the defense. Instead, Harris and Carwell relied solely on evidence admitted during the government's case-in-chief, mainly the recorded transcripts of their meetings with Moore, Agent Gomez, and the other

defendants. Thus, the court is left with an evaluation of the government's evidence in order to determine whether there is sufficient evidence from which a reasonable jury could find entrapment.

*Mayfield* also observed that predisposition is more amenable to pretrial disposition than inducement because predisposition is a "probabilistic question" that is "quintessentially factual." *Id.* Here, both inquiries were appropriately resolved before trial, in large part because of the absence of a proffer from Harris and Carwell. *United States v. Hall*, 608 F.3d 340, 345 (7th Cir. 2010) ("It would be unusual for the government's case-in-chief to reveal a defendant's lack of predisposition. Except in unusual circumstances that we have trouble imagining, a defendant would seem to need to present some affirmative evidence of entrapment").

### A.  Inducement

Inducement means more than "mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement." *Mayfield*, 2014 WL 5861628 at *17. Instead, inducement means solicitation "*plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id.* (emphasis in original). Such conduct may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics,

harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id.*

Harris and Carwell argue that the promise of obtaining a large amount of drugs, in addition to "hundreds of thousands of dollars" of actual cash on hand, qualifies as improper inducement. This argument has been considered and repeatedly rejected. Harris and Carwell were "presented with the same temptation faced by any person contemplating the robbery of a drug stash house: the chance to acquire quickly a large amount of drugs that could be resold for a big profit." *Hall*, 608 F.3d at 344; *see also United States v. Millet*, 510 F.3d 668, 677 (7th Cir. 2007). The promise of drugs *plus* cash does not alter the analysis. *See Millet* 510 F.3d at 677 ("this case stands in stark contrast to the classic example of extraordinary inducement, i.e., where 'the police offered a derelict $100,000 to commit a minor crime that he wouldn't have dreamed of committing for the usual gain that such a crime could be expected to yield, and he accepted the offer and committed the crime…'").

Cases such as *Hall* and *Millet* use the term "extraordinary inducement." In *Mayfield*, the court clarified the meaning of this terminology by looking to the Supreme Court's foundational entrapment cases—*Sorrels*, *Sherman*, and *Jacobson*. In those cases, the entrapment defense was available because the

government's solicitation of the crime was "accompanied by subtle and persistent artifices and devices that created a risk that an otherwise law-abiding person would take the bait. The ploys were not 'extraordinary' in the strong sense of the word, but they exceeded the typical sting in which the government merely offers an ordinary opportunity to commit a crime, without more." *Mayfield*, 2014 WL 5861628 at *17.

Harris and Carwell were not subject to anything that would transform the government's solicitation into something more than an "ordinary opportunity to commit a crime." During the planning and solicitation of the robbery, Moore (the confidential informant) stated that he was going to "work on" securing Harris's participation. However, Moore also stated that he wouldn't "waste his time" trying to convince Harris to join the conspiracy, and that the robbery would go forward with or without Harris. Agent Gomez (Loquito) repeated the same sentiments later in front of all of the defendants, telling them that he would "find another crew" if they wanted to back out. Thus, the offer was a take-it-or-leave-it proposition. In *Mayfield*, by contrast, the government "paired the reward of a stash-house robbery with an extended campaign of persuasion that played on Mayfield's financial need and culminated in a veiled threat of reprisal from a vicious street gang." *Id.* at *24. Nothing of the sort occurred here. Where the government does nothing more than make a stash house robbery available, there is no inducement under the law of entrapment.

### B. Predisposition

A defendant can be considered predisposed if he was "ready and willing" to commit the charged crime and "likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at \*21. Predisposition is measured "at the time the government first proposed the crime, but the nature and degree of the government's inducement and the defendant's responses to it are relevant to the determination of predisposition." *Id.* Prior convictions for similar offenses are "relevant but not conclusive evidence of predisposition; a defendant with a criminal record can be entrapped." *Id.*

Carwell's predisposition is aptly demonstrated by his overwhelming enthusiasm for the venture. Carwell explained how "hungry" he was for the opportunity, an opportunity that he and the other defendants had been waiting on for years. Carwell even reveled in how much money he was going to make by "flooding the city" with his share of the cocaine. *Id.* at \*19 ("the defendant's response to the government's offer may be important evidence of his predisposition"). Given that the government's offer was an ordinary opportunity to engage in criminal activity for profit, Carwell's reaction to the offer is powerful evidence that he was predisposed. *Id.* ("This is where the conceptual overlap between the two elements becomes important: The character and degree of the inducement—and the defendant's reaction to it—may affect the jury's assessment of predisposition").

Harris argues that his refusal to get into Agent Gomez's van, and then his refusal to follow Gomez into the gated part of the storage facility, demonstrates that he was reluctant to commit the robbery. *Id.* at *20 ("the defendant's reluctance to commit the crime looms large in the analysis of predisposition"); *see also Pillado*, 656 F.3d at 766 ("the most significant fact is whether the defendant was reluctant to commit the offense"). Accepting these facts as true, Harris still fails to meet the low threshold created in *Mayfield* to establish a lack of predisposition. Harris, like Carwell, willfully participated in the planning for the execution of the stash house robbery, and he arrived at the rendezvous point on time, fully-armed, and prepared to take action. In this context, Harris' reluctance to follow certain aspects of the plan is not enough to show a lack of predisposition to commit the robbery.

Finally, Harris had a four-year-old conviction for unlawful use of a weapon for entering a house with a firearm and a three-year old aggravated battery conviction for kidnaping and beating a fellow inmate in the Kane County Jail. These convictions demonstrate that Harris was predisposed to use guns and commit violence in violation of the law. Carwell had an 18-month old conviction for delivery of a controlled substance—9 grams of cocaine—which demonstrates that he was predisposed to join a drug trafficking conspiracy.

***

In sum, no reasonable jury could find that either Harris or Carwell were entrapped. Therefore, the district court did not err in precluding the defense at trial.

### III. Sufficiency of the Evidence

All of the defendants argue that the evidence was insufficient to convict them beyond a reasonable doubt of conspiring to possess with intent to distribute five kilograms or more of cocaine. 21 U.S.C. §846. In making this argument, the defendants face a "formidable hurdle." *United States v. Kindle*, 698 F.3d 401, 405 (7th Cir. 2012). We construe the record "in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Mota*, 685 F.3d 644, 650 (7th Cir. 2012). "Overturning a guilty verdict for lack of evidence is serious business; we are essentially asked to take the case out of the jury's hands, something we will do 'only if the record contains no evidence, *regardless of how it is weighed*, from which the jury could find guilt beyond a reasonable doubt.'" *Kindle*, 698 F.3d at 406 (quoting *Mota*, 685 F.3d at 650) (emphasis added in *Kindle*).

To obtain convictions under §846, the government needed to prove that the defendants "agreed to acquire cocaine for distribution." *United States v. Walker*, 673 F.3d 649, 654 (7th Cir. 2012). Carwell was very clear in explaining his goals—to rob the stash house, divide the cocaine among his co-conspirators, and then "flood the city" with cocaine. The other defendants were not so explicit, but the evidence supporting their guilt was overwhelming nonetheless. The day before the robbery, all of the defendants discussed how to execute the robbery. Specifically, the defendants confirmed that the only way to get

all fifteen kilograms of cocaine was to jointly invade the stash house. A jury could "reasonably believe that no sane person would rob a stash house guarded by armed gang members to score some recreational drugs for personal use. For a jury to reach such a conclusion hardly requires the impermissible piling of inference upon inference, but rather is the sort of rational result from circumstantial evidence we ask juries to determine every day." *United States v. Lewis*, 641 F.3d 773, 782 (7th Cir. 2011); *see also United States v. Spagnola*, 632 F.3d 981, 987 (7th Cir. 2011) ("The evidence was sufficient to show that [the defendants] conspired to obtain the cocaine for re-distribution; any uncertainty as to precisely how they would sell the drugs does not upset the verdict"). Because there was sufficient evidence for the jury to conclude that the defendants agreed to commit a drug trafficking crime, there was also sufficient evidence for the jury to conclude that the defendants were carrying firearms in connection with that crime. 18 U.S.C. §924(c).

For similar reasons, the district court correctly rejected the defendants' proposed non-pattern jury instruction: "A planned robbery of a drug stash house, without more, does not constitute a conspiracy to possess drugs with the intent to distribute them." To repeat, a properly instructed jury is entitled to draw the inference that a plan to rob fifteen kilograms of cocaine from a house protected by armed criminals amounts to an agreement to acquire cocaine for distribution. In that respect, the proposed instruction was an incorrect statement of law. It was also confusing and unnecessary. "Unless it is necessary to give an instruction, it is necessary not to give it, so that the

important instructions stand out and are remembered." *United States v. Hill*, 252 F.3d 919, 923 (7th Cir. 2001).

## IV. Evidentiary Ruling

Harris argues that the district court violated his constitutional right to confront an adverse witness by not allowing him to cross-examine Agent Gomez about why the final transcript of the August 15 meeting attributed one line—"So the plan is[,] look (unintelligible)"—to Harris, whereas an earlier draft of the transcript attributed that line to someone else. This ruling is reviewed for an abuse of discretion, and it is subject to reversal only if "no reasonable person could take the view adopted by the trial court." *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008).

Harris wanted to question Agent Gomez about the discrepancy between the draft transcript and the final transcript in an effort to establish that the government wrongfully attributed this statement to Harris. The district court ruled that there was no evidentiary basis to question Gomez about the draft transcript because Gomez could not say if he had prepared or reviewed the draft in the first instance. This was a reasonable justification to preclude the admission of the draft transcript, not an abuse of discretion.

Moreover, while the district court admitted the "final" transcripts into evidence, the court instructed the jury that it was up to them to decide whether the transcripts accurately reflected the recordings. Tr. at 71-72. On top of that, the

government never mentioned or attempted to attribute the line to Harris in closing arguments. It didn't need to, because the evidence supporting Harris' guilt was overwhelming. If the district court erred, its error was harmless beyond a reasonable doubt. *United States v. Williams*, 493 F.3d 763, 766 (7th Cir. 2007) ("The test … is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained'") (quoting *Chapman v. Cal.*, 386 U.S. 18, 24 (1967)).

## V.  Sentencing

The defendants argue that they are entitled to re-sentencing based on the doctrines of sentencing entrapment and sentencing manipulation. Sentencing entrapment occurs "when a defendant who lacks a predisposition to engage in more serious crimes nevertheless does so 'as a result of unrelenting government persistence.'" *United States v. Knox*, 573 F.3d 441, 451 (7th Cir. 2009) (citing *United States v. White*, 519 F.3d 342, 347 (7th Cir. 2008)). The court already explained how Harris and Carwell were predisposed; Blitch and Washington were similarly eager to participate in the robbery, and none of the defendants were pressured by the government to accept the offer to rob the stash house.

Sentencing manipulation is distinct from entrapment and occurs when the government "procures evidence 'through outrageous conduct solely for the purpose of increasing the defendant's sentence under the Sentencing Guidelines.'" *Knox* 573 F.3d at 451. This circuit does not recognize sentencing manipulation as a valid defense, but it "could be relevant to a

district court's application of the [18 U.S.C.] §3553(a) factors" at sentencing. *Id.* at 452. Regardless, the argument is nonstarter here because the defendants were sentenced to the statutory minimum of 25 years' imprisonment. *United States v. Wilson*, 129 F.3d 949, 951 (7th Cir. 1997) (district court may not use the doctrine of sentencing manipulation to impose a sentence below a statutory minimum).

Finally, the defendants argue that their sentences amount to cruel and unusual punishment under the Eighth Amendment, which "contains a narrow proportionality principle that applies to noncapital sentences." *United States v. Nagel*, 559 F.3d 756, 762 (7th Cir. 2009). A successful proportionality challenge is "exceedingly rare," and the Supreme Court's precedent "reflects how high the bar is set." *United States v. Gross*, 437 F.3d 691, 693 (7th Cir. 2006) (collecting cases rejecting proportionality challenges, including a 25-years-to-life sentence for stealing golf clubs under California's three-strikes law, *Ewing v. Cal.*, 538 U.S. 11, 22 (2003), a life sentence for a first-time offender possessing 672 grams of cocaine, *Harmelin v. Michigan*, 501 U.S. 957, 996 (2003), and two consecutive 20-year sentences for possession with intent to distribute 9 ounces of marijuana, *Hutto v. Davis*, 454 U.S. 370, 370-71 (1982)). Conspiring to rob a drug stash house containing a distribution-level amount of cocaine is not a minor offense. Accordingly, this is not the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Gross* 437 F.3d at 692–93.

***

For the foregoing reasons, the defendants' convictions and sentences are AFFIRMED.