In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3348

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

EDDIE BANKS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 848—**James F. Holderman**, *Chief Judge.*

ARGUED MAY 28, 2008—DECIDED OCTOBER 9, 2008

Before EASTERBROOK, *Chief Judge*, and RIPPLE and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case illustrates the critical role that the standard of appellate review can, and must, play in our judicial system. As we explained in *United States v. Williams,* 81 F.3d 1434 (7th Cir. 1996), "[it] is difficult for nonlawyers to understand or accept . . . that because the question whether to grant a new trial is committed to the discretion of the district judge, as the

defendants rightly concede, *United States v. Knox*, 68 F.3d 990, 1000 (7th Cir. 1995); *United States v. Maloney*, 71 F.3d 645, 654 (7th Cir. 1995), it is possible for two judges, confronted with the identical record, to come to opposite conclusions and for the appellate court to affirm both. That possibility is implicit in the concept of a discretionary judgment." 81 F.3d at 1437 (emphasis removed). In *Williams*, we found that one district judge did not abuse his discretion when he refused to grant a new trial based on the government's use of perjured testimony, even though we had found that a different district judge who was trying other defendants involved in the very same conspiracy also did not abuse his discretion when he did grant a new trial based on exactly the same perjured testimony. See *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995).

In the case now before us, defendant Eddie Banks was charged in a multi-defendant indictment with four drug-related counts (counts 1, 10, 30, and 31). A jury convicted Banks on all four counts and made a special finding for counts 1 and 10 that the conspiracy and distribution offenses involved at least 500 grams but less than 5 kilograms of cocaine. Based on information that came to light after the jury delivered its verdict, Banks moved for a new trial. The district court granted a new trial on count 10 and a new trial on the drug type and quantity applicable to counts 1 and 10. The Government has appealed from those orders. Bearing in mind the fact that, just as in *Williams* and *Boyd*, we are reviewing only for abuse of discretion, we affirm.

**I**

A great deal of evidence was presented against Banks in his drug trial. The Government collected numerous recorded telephone conversations between Banks and others relating to cocaine deals. Informant and drug dealer Clarence Whalum testified that he sold cocaine to Banks every two or three weeks in quantities ranging from over two ounces to one kilogram, and that he participated in a controlled sale of a kilogram of cocaine to Banks. There was also police testimony describing surveillance of Banks immediately after the purchase from Whalum. Officers pulled Banks over for a traffic infraction, seized the package that Banks had hastily stashed in his pants, released him to protect the integrity of their investigation into the drug conspiracy, and then arrested him on a later occasion. Finally, at the center of this appeal is the expert testimony of Drug Enforcement Administration (DEA) forensic chemist Theresa Browning, who testified that she had tested the material in the package seized by police and found that it was 999.1 grams of cocaine hydrochloride. The theory of the defense was that Banks was not the person who was pulled over by the police in possession of the package that later tested positive for cocaine.

After the jury returned a verdict of guilty on all four counts, the prosecution and defense learned for the first time that Browning was under investigation at the time of trial for professional misconduct, described further below. Banks moved for a new trial based on the Government's failure to disclose this impeaching information. The

district court concluded that a new trial was necessary only on count 10 and the special finding of drug type and quantity relating to counts 1 and 10, and it entered an appropriate order, from which the Government has appealed. See 18 U.S.C. § 3731, ¶ 1. (Banks's convictions under counts 30 and 31 for using a telephone to facilitate a violation of the drug laws are not affected by the district court's order.)

Information brought out during a post-trial hearing revealed that at the time she testified, Browning was fighting off accusations about misuse, or possibly even fraud, in connection with the use of her government-issued credit card. As a federal employee, Browning was entitled to have the card for purposes of covering expenses related to her government employment—primarily travel expenses. Normally, before the due date for payment on the credit card, the Government would deposit directly into her bank account money to cover the expenses. She was required to use these funds to pay the credit card bill, and timely payment was required. In March 2006, however, Browning used the deposited funds to pay for personal expenses and then had insufficient funds available when her government credit card bill came due. This constituted misappropriation of those funds. Browning waited until her next paycheck came and then paid off the card, but her payment was one week late. She had not requested an extension and did not self-report this violation.

When the misconduct was discovered, Browning feared that she would lose her job and asked her supervisor to

"keep the consequences at the laboratory level"—in other words, not to let the higher-ups at DEA know about her misstep. The supervisor did not honor this request, and instead reported Browning's violation to the DEA Office of Professional Responsibility (OPR), which investigated the matter. OPR interviewed Browning approximately four months prior to her testimony in Banks's trial, and Browning heard nothing further about the status of the investigation for a long time. She still knew nothing at the time of her testimony at Banks's trial, but she heard from OPR a few days after the trial was over. In the end, the only professional consequence she suffered from her misconduct was the agency's issuance of a letter of caution warning her to make future payments in a timely manner. The letter was issued on October 4, but Browning did not receive it until October 20, after testifying against Banks on October 17, 2006. The prosecutors did not know anything about Browning's problem until after the trial.

## II

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government has a duty to disclose evidence favorable to the defendant, whether the evidence is exculpatory or tends to impeach a Government witness. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Nonetheless, a violation of this duty, whether intentional or inadvertent, entitles the defendant to a new trial only if the failure to disclose the evidence resulted in denial of a fair trial. *Id.* at 281-82. The latter condition is satisfied only when the suppressed

evidence is material, meaning when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The only point of dispute in this case is whether the undisclosed information was "material" in the *Bagley* sense of the term. The Government has not argued that Browning's testimony related only to the underlying question whether the substance was really cocaine, and, on that point, the defense was just as well positioned to test it as the prosecution was. If the evidence about Browning's legal problems was material, then Banks was entitled to a new trial. The district court held that the fact that Browning was under investigation by her government employer at the time she tendered testimony favorable to the Government in Banks's criminal case was material impeachment evidence with respect to the guilt phase on count 10, and material with respect to the sentencing factors of drug type and quantity for counts 1 and 10.

At oral argument, a member of the panel raised the question whether the *Brady* rule should be invoked to grant a new trial for non-disclosure of this type of impeachment evidence. The question is first whether we should be focusing not on Browning but on the topic of her testimony—the nature of the substance—and second, whether the law draws any distinction between a witness who may be lying about a verifiable subject and a witness who may be lying about a non-verifiable subject (such as a visual observation). Under the theory

(once again, not presented by the Government) that the only question is whether the substance in the package was really cocaine, one might ask what a new trial would accomplish. If Banks had impeached Browning with this evidence, then the Government now asserts that it would simply have put a different expert on the stand (presumably one whose work could not be impeached, though without a crystal ball, it is hard to be confident about that). The Government did not proffer evidence to this court that later tests have confirmed Browning's chemical findings. It has only alleged that Browning was the second chemist to test the material and determine it to be cocaine, but it has not provided either the name, the date, the laboratory, or any other information about this supposed earlier test. Indeed, it supports this assertion only by pointing to *Browning*'s testimony that she was the second chemist to make such a finding.

If we are to acknowledge the possibility that Browning's conflict of interest led her to falsify her own chemical analysis and commit perjury, we cannot rely on her own testimony that her findings were corroborative of another chemist's. We note as well that reasonable people could disagree about the effect of Browning's troubles on her testimony. Some might think that her credit-card misuse might have prompted her to be especially careful when she tested the substance, so that she could demonstrate what a valuable employee she is. On that theory, the missing evidence would not even have impeached her. Others might think that her employment problems might have caused her to rush the job and to say whatever she thought the prosecutor wanted to hear,

counting on the fact that it probably was cocaine anyway. But see *United States v. Salgado,* 519 F.3d 411, 412 (7th Cir. 2008) (dealer could not find genuine cocaine and was planning to cheat buyer). The fact that there are at least two plausible explanations indicates that the choice between them was one for the district court to make.

We therefore save for another day any more thorough exploration of the theory that, in evaluating motions for new trial based on evidentiary problems, we must focus on alternative ways that the objecting party might have proved the point on which the witness was going to testify, and that there is a distinction embedded in the law between verifiable and nonverifiable observations. Perhaps such a distinction would make sense. Perhaps, every time either the Government or a defendant wants a new trial based on a problem with an expert witness, there should first be a hearing to see if an alternate expert might have been produced by the affected side who would have said the same thing as the tainted expert. On these facts, it may have been better if the district court had held such a hearing. But to acknowledge that is not to say that the court abused its discretion by taking the course it did. We thus proceed to consider the Government's appeal on the basis of the facts and arguments that were presented to the district court and briefed here.

### III

In its effort to persuade us that the district court abused its discretion in granting the limited new trial it did, the Government first argues that the court applied the wrong

legal standard. According to the Government, the district court collapsed the materiality inquiry into the definition of impeachment evidence. What the district court said was that the impeachment evidence was material because it was

> *sufficient to cause a reasonable jury to question DEA Forensic Chemist Browning's credibility and reject, if the jury chose to do so, her opinion* as an expert due to the bias she was harboring as a result of a desire to minimize the punishment she was yet to receive for her unprofessional conduct that was the subject of the undisclosed DEA scrutiny at the time of her testing Government Exhibit 4-C and her testimony at the trial.

(Gov. Short App. 2) (emphasis added).

We do not read the district court's remarks as the Government does. The court's comments must be understood in light of the evidence that had been introduced at trial. Of the witnesses testifying, only Browning and drug dealer Whalum had first-hand knowledge of the contents of the package in question. Whalum, aside from being a significant drug dealer and having entered into an agreement with the Government in exchange for his testimony against Banks, also used a shocking amount of drugs on a daily basis. (The evidence showed that he had an amazing daily consumption of one to two fifths of hard liquor, at least two pills of ecstasy, and ten to twenty marijuana-filled cigars.) A jury easily could have found that Whalum's memory and perception were compromised and unreliable, and then rejected Browning's testimony on the basis of her possible bias. That would have left this

jury with no credible testimony about the nature of the package.

The Government counters this inference with various witnesses who testified about "the cocaine" without objection from the defense, even quoting defense counsel's reference to "the cocaine" during closing. It points out that the nature of the package was not even at issue in the trial—identity was the only issue. Banks, it says, just contested the Government's claim that the person who was eventually arrested (himself) was the same one who was stopped by the police after the controlled sale, and from whom the package was seized. But Banks based his strategic choice on the information before him. Had he known about Browning's problem, he may have sought an independent test of the substance in the package. (The Government may assume that the reason Banks did not do so was because he already knew what the outcome of such a test would be, but there is no evidence in the record to support such a finding apart from that of Whalum and Browning.) Even without his own independent test, Banks would surely have used the information about Browning to attempt to impeach her testimony about the nature of the substance.

The Government also points out that Browning stated during her testimony that she was the second chemist to test the material, and that her findings were the same as the findings of the prior chemist. This is not helpful. As we have already noted, the materiality analysis requires us to suppose that the impeachment evidence would cause the jury to find that Browning willfully

falsified test results and committed perjury by testifying that the substance was cocaine when it was not cocaine. If all that is true, then the jury would be further entitled not to credit her testimony that another chemist had tested the material and come up with the same results. Thus, this bit of Browning's testimony about the prior chemical test does not save the Government from a possible failure of credible proof regarding the nature of the package.

The Government next argues that if Banks is allowed to benefit from a hypothetical analysis of what his trial strategy would have been had he known about the impeaching evidence, the Government should be allowed to do likewise. The Government claims that, had it known about the OPR investigation of Browning prior to trial, it could easily have found another unimpeachable chemist to test the sample and testify to its contents in place of Browning. (For the post-trial hearing, it produced a declaration from a DEA director confirming the availability of other chemists to conduct the test.)

Whether the Government's prediction is true or not, this point does not convince us that the district court applied the wrong legal standard to the motion for a new trial. The court was not required to accept on faith the Government's assertion that its replacement chemist would have been unimpeachable. While we hope that this is now true of most, if not all, of the Government's experts, experience suggests that such an expectation might be too optimistic. See, *e.g.,* David Johnston & Andrew C. Revkin, *Report Finds F.B.I. Lab Slipping from Pinnacle of Crime Fighting*, N.Y. TIMES, Jan. 29, 1997, at A1. The district court was

entitled to make a discretionary finding that the opportunity to undermine the credibility of the chemist that the Government did in fact call to testify sufficed to create a reasonable probability of a different outcome in the case.

## IV

Even if the district court did not apply the wrong standard, the Government argues that it still abused its discretion in finding that the impeachment evidence was material.

We have already discussed the Government's arguments that the impeachment evidence was not material because the presence of cocaine was not at issue in the trial, and that a supposed prior chemist had, according to Browning, already tested the substance and found it to be cocaine. The Government also points to other circumstantial evidence regarding the nature of the package, such as Banks's consciousness of guilt at the time of the seizure, given that he had stuffed the package down his pants, and the fact that he paid $14,000 for the package. This evidence was helpful to the Government's case against Banks, but it does not carry such irrefutable force that we can say that the district court abused its discretion in finding that rejection of the chemist's expert testimony would create a reasonable probability of a different verdict. The Government also notes that the jury examined the package in the jury room. While this examination may have allowed the jurors to determine that the package weighed somewhere in excess of 500 grams, we fail to see how a visual examination by lay—and presumptively law-abiding—jurors

would allow the jury to determine beyond a reasonable doubt that the package contained cocaine as opposed to some other look-alike substance.

The Government next claims that the impeachment evidence was not material because the potential for bias was exceedingly weak. First, it points out the "relatively minor" nature of Browning's offense. This is a subjective judgment; the district court was not required to presume that the jury would find the offense to be so relatively minor that they would have no reason to believe that Browning was concerned about her job. Indeed, Browning admitted her concern about the matter and that she had asked her boss to minimize the repercussions. That request was denied; the supervisor thought the problem significant enough to report it up the chain of command to the OPR.

Second, the Government notes that Browning worked for the DEA, while Banks's case was investigated by a separate agency, the FBI. The DEA had no interest in whether cocaine was found in the sample or whether Banks was convicted or acquitted. Thus, the argument goes, Browning would not be currying favor with her employer by falsifying her chemical tests and committing perjury on the stand—quite the contrary. In its reply brief, the Government explains how the exertion of pressure on Browning to testify falsely would require a rather far-fetched and implausible theory of inter-agency governmental conspiracy. On the other hand, the relations among government agencies and departments can be byzantine, and the jury would not necessarily have followed the

Government's argument. In particular, the jury might not have bought the Government's assertion that the two agencies (both part of the Department of Justice, incidentally) were so insulated from one another that impropriety was impossible. Indeed, the mere fact that the Government concedes that the DEA investigation into Browning's misconduct was relevant to the question of bias (as opposed to merely a lack of credibility) is a concession that it is plausible that Browning felt pressure to testify favorably to the Government because of her pending disciplinary action. We therefore cannot say that the district court abused its discretion in finding that cross-examination on this issue might have had a real impact on the jury's willingness to rely on Browning's testimony (and thus an impact on the jury's finding with respect to the essential element of the nature of the substance in the package).

In summary, although acquittal may have been less likely than conviction even if the impeachment evidence had come to light in time, we cannot say that the district court abused its discretion when it found that the information about Browning was material. The court thus did not abuse its discretion in ordering a new trial on count 10 and on the drug type and quantity issues relevant to counts 1 and 10. For these reasons, we AFFIRM the judgment of the district court.

EASTERBROOK, *Chief Judge*, dissenting.   To establish a violation of the due process clause, Banks had to show that Browning's credit-card problem was exculpatory evidence. Even then, a new trial is appropriate only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The district judge never decided whether the credit-card evidence was exculpatory. His opinion, which covers less than two pages, asserts that the evidence was impeaching but does not say why. The judge must have assumed that the credit-card problem gave Browning an incentive to ingratiate herself with the DEA by identifying the substance as cocaine whether it was or not, and that the defense could have used this motive to undercut her testimony. But that is hardly the only available inference.

Because Browning's assertions could have been verified or refuted by other evidence, her financial difficulties gave her a reason to be extra careful, not a reason to commit perjury. A chemist found to have lied about a substance's composition will be fired and may be prosecuted. Careless analysis (short of perjury) will be less acceptable from a chemist who is in hot water than from a chemist with a spotless record. Defense counsel would have stepped on a land mine by introducing the credit-card evidence, only to have Browning reply "yes, because I was in trouble for financial issues I took extra care to analyze this sample"; the prosecutor then could have elicited on re-direct that chemists who misidentify a substance are disciplined

and reminded the jury that the defense could have had the substance analyzed by a forensic chemist.

My colleagues say (slip op. 8) that when "there are at least two plausible explanations [one impeaching and the other not] the choice between them was one for the district court to make." I agree with this principle. Unfortunately, the district court did not make the choice. The court simply *assumed* that the credit-card evidence would have undermined rather than strengthened Browning's testimony. We can't apply a deferential standard of appellate review when the district court has not confronted the competing inferences and made a reasoned choice. See, e.g., *United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987)

If the evidence would have undermined Browning's analysis, a further question must be explored. What would have happened had the prosecutor known about this evidence and revealed it to the defense? The district court assumed that Browning would have testified and been impeached. But there is another possibility. The prosecutor might have used a different chemist. Then no impeaching evidence would have been before the jury, and the trial would have proceeded exactly as it did. That replacement chemist's testimony would not have been undercut. This is exactly what a declaration filed by the prosecutor (Domagala Declaration at ¶6) says would have happened. On this understanding withholding the credit-card information did not hamper the defense. It changed the identity of the chemist but not the substance of any testimony.

According to the majority, the district court "was not required to accept on faith the Government's assertion that its replacement chemist would have been unimpeachable." Slip op. 11. I agree: Never is a district judge required to accept something on faith. Once again, however, the problem is that the district judge did not even *mention* this subject. No testimony was taken; no facts were found; no discretion was exercised.

Nor *could* the district judge have rejected Domagala's submission. There is no contrary evidence. A judge cannot preemptively disbelieve statements in an affidavit. At the post-trial hearing when Browning testified about her financial troubles, the district judge could have demanded that the prosecutor produce Domagala or other proof about what could have been done to replace Browning. After entertaining evidence from both sides, the judge could have made findings of fact. But that was not done.

Everything I have said so far rests on arguments presented to the district court and reiterated in the prosecutor's appellate brief. There are deeper problems with the district court's approach, however. Perhaps the prosecutor thought it unnecessary to discuss them, so clear are the errors I have mentioned. But they are still worth attention, because they put the issues in perspective.

The premise of *Bagley*, which extended *Brady v. Maryland*, 373 U.S. 83 (1963), from primary exculpatory evidence to material that could be used to impeach a witness, is that a witness's credibility can be vital to the strength of the prosecution's case. That will be so when the testimony

is not verifiable (the witness testifies to something seen or heard, for example). It is not so when the witness's contentions can be checked by a third party. If, for example, a witness testifies that a particular document contains particular language, the best way to find the truth is to look at the document, not to inquire whether the witness has a felony conviction or is in financial trouble or has told a contradictory story to someone else.

Everything that Browning said could have been checked. The question at hand was whether the seized substance is cocaine, not whether Browning had analyzed that substance correctly (or was telling the truth about her own analysis). Conviction (or acquittal) depends on what the substance actually is. Cf. *United States v. Moon*, 512 F.3d 359 (7th Cir. 2008) (lab results are not "testimonial" under the confrontation clause).

*Brady* applies only to evidence that is known to the government but not the defense. The seized substance, however, was available to the defense. The jury found that Banks was the person from whom the substance had been seized (that conclusion, which is essential to the verdict, is not undermined by any problem in Browning's testimony), and Banks himself knew what he was carrying. More: the substance could have been analyzed by the defense. The Treasury would have paid for a chemist to analyze it on defendant's behalf. 18 U.S.C. §3006A(e)(1). Because the substance was available to both sides, there cannot have been a *Brady* problem.

If Banks thought that the substance was not cocaine (or even that there was a serious question about its composi-

tion), defense counsel would not have relied exclusively on trying to impeach the DEA's chemist—and at trial defense counsel did not even try to impeach Browning. (Counsel waived cross-examination.) To challenge Browning's conclusions, the defense would have needed its own expert and could have had the substance analyzed readily. Yet Banks has never denied that the substance is cocaine and has never had it tested (at least, has not argued that tests undermine Browning's results; perhaps a defense expert confirmed Browning's conclusions). It would be absurd to hold a new trial to establish, for a second time, something that is uncontested.

Once Browning's credit-card problem came to light, and the prosecutor said that it would have been easy to use another chemist, the district judge had to decide what would have happened. The evidentiary hearing at which Browning testified about her finances should have explored two other issues: First, would the prosecution have used another chemist? Second, what would this other chemist have said? Suppose the prosecutor had testified that he would have used another chemist, and the judge had believed this. Then there would be no basis for another trial, unless there is good reason to think that the second chemist would reach a conclusion different from Browning's. And the best way to find out is to appoint an independent (non-DEA) expert and have that expert analyze the substance.

This case went off the rails because the parties failed to alert the district judge to the distinction between verifiable and non-verifiable testimony. When impeaching evidence

about a non-verifiable subject (such as whether a witness saw the defendant shoot the victim) comes out after trial, the only way to probe that subject's significance is to hold another trial with all evidence placed before the jury. But for a question such as "is substance X cocaine or sugar?", there is a way to explore materiality without a new trial. Unless a fresh expert analysis of the substance would undermine Browning's analysis, a new trial would be pointless. The defense bears the burdens of production and persuasion on *Brady* claims; the gaps in the record mean that the outcome of the trial stands.