In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1486

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ARMANDO MOTA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 08 CR 187—**Philip P. Simon**, *Chief Judge.*

ARGUED MARCH 28, 2012—DECIDED JULY 6, 2012

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted Armando
Mota of attempting to distribute 500 grams or more of
cocaine and of possessing with the intent to distribute
500 grams or more of cocaine, in violation of 21 U.S.C.
§ 841(a)(1) and 21 U.S.C. § 846. At the start of his jury
trial, Mota learned that a government agent had failed
to record and relay exculpatory evidence regarding a con-
versation between the agent and Mota's co-defendant,

Jorge Ponce, during which conversation Ponce assumed complete responsibility for the crime and proclaimed Mota's innocence. On appeal, Mota argues that the agent's failure to record the conversation and to pass on the information to Mota violates *Brady v. Maryland*, 373 U.S. 83 (1963), and that he is thus entitled to a new trial. While the failure to transmit exculpatory evidence was inexcusable, Mota learned of this evidence at the start of his trial and thoroughly presented it to the jury. Also, because Mota had the opportunity to cross-examine the negligent agent and because Ponce testified on Mota's behalf, we cannot conclude that Mota was denied a fair trial. Mota also argues that the evidence presented by the prosecution is insufficient to sustain his conviction. Considering the evidence presented by the prosecution at trial which included testimony from the government informant who met Ponce and Mota in order to conduct a drug deal and the audio recording of this sting operation, we find there was sufficient evidence from which a jury could find guilt beyond a reasonable doubt. Therefore, we affirm the judgment of the district court.

I.

The government's case against Mota and his co-defendant Ponce began with Rafael Contreras, a government informant working with the Drug Enforcement Administration (DEA) and DEA Task Force Agent Robert Aponte. Contreras knew that Ponce was involved in drug dealing, and he conveyed this information to Agent

Aponte. Agent Aponte then told Contreras to try to arrange a drug deal with Ponce, and Contreras did so. On October 9, 2008, Contreras spoke with Ponce on the telephone, and the two men set up a drug deal for the next day at Ponce's home in Hammond, Indiana. Ponce explained that he had a drug source and that his source would sell Contreras one kilogram of cocaine for $29,000.

The next day, Ponce telephoned Contreras and confirmed that the drug deal was going forward. Law enforcement then equipped Contreras with a hidden audio recording device and secured a search warrant for Ponce's home. At some time around 1:00 p.m., Contreras arrived at Ponce's house, where he found Ponce, Mota, and the cocaine. The three men conversed about the cocaine in Spanish; in Contreras's account of the events, Mota did most of the talking and guaranteed the cocaine's quality and purity. Contreras then told Ponce and Mota that he had to call the man who had the money for the deal. Contreras stepped out of the house and called the DEA agents who were waiting nearby. The agents then came to the door of the house and knocked, but no one answered. The agents were forced to use a battering ram in order to breach the door, and entered after a few minutes. They found Mota in the kitchen and Ponce in the basement, and arrested both men. After an hour and a half of searching, they discovered the kilogram of cocaine secreted in between the wall and the bathtub in the basement bathroom.

When Mota was arrested, he was carrying a cell phone. Ponce's phone records later showed that on the night

before the drug deal, Ponce first spoke with Contreras over the telephone and then immediately called the cell phone Mota was carrying at the time of his arrest. Similarly, the records showed that the next morning, Ponce telephoned Contreras to confirm the deal and, two minutes later, Ponce again called Mota.

The government also obtained the audio recording of the Spanish conversation among Contreras, Ponce, and Mota during the drug deal, and prepared an English translation of the recording. Using other recordings of Mota's and Ponce's voices, the government determined that Mota had said the word "guaranteed" three times and "clean" twice when allegedly referring to the cocaine. Contreras reviewed the translation, and confirmed the accuracy of the translation and the identity of the speakers.

Ponce and Mota were charged in an indictment with attempting to distribute 500 grams or more of cocaine and with possession with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. Ponce pleaded guilty to both charges, while Mota opted for a jury trial.

At Mota's trial in October 2009, the prosecution's theory of the case was that Mota was a full participant in the drug deal and was the dealer and source of the cocaine. In support of its case, the prosecution called Contreras as a witness, who gave his testimony of the events as we have described above. The prosecution also presented as evidence the translation of the audio recording from the drug deal and Ponce's cell phone records.

The defense's theory of the case was that Ponce was solely responsible for the drug deal and Mota had no involvement—and that Mota happened to be at Ponce's house during the drug deal by chance because he had been helping Ponce with some home remodeling. Right at the start of Mota's trial, Mota's counsel discovered important exculpatory evidence that had also been unknown to the prosecution: five days after Ponce's arrest, Agent Aponte had interviewed Ponce in jail and Ponce had taken full responsibility for the drug deal, while stating that Mota was completely innocent and uninvolved. During this interview, Ponce also allegedly told Agent Aponte that the cocaine source was not Mota but a man named "Teflon" who had delivered the cocaine to Ponce's house earlier in the day. Agent Aponte failed to make a record of his conversation with Ponce and failed to report the substance of the conversation to his supervisors. Accordingly, the information from the interview was never disclosed to Mota or to his counsel before trial. But because Mota's counsel learned of this information at the start of the trial, Mota's counsel was able to cross-examine Agent Aponte on this issue and called Ponce as the sole witness for the defense. On the stand, Ponce acknowledged his own guilt but insisted that Mota was coincidentally at his house doing renovations, and that someone named "Teflon" had earlier delivered the drugs to the house and then departed.

Despite Ponce's testimony in favor of Mota's innocence, the jury returned a guilty verdict and Mota was later sentenced to 63 months' imprisonment. Mota then filed this appeal.

II.

Mota makes two arguments on appeal: (1) that Agent Aponte's failure to disclose his conversation with Ponce in jail five days after Ponce's arrest constitutes a *Brady* violation entitling Mota to a new trial; and (2) that there is insufficient evidence to support Mota's conviction. We consider each issue in turn.

A.  *Brady* Violation

Mota failed to raise a *Brady* violation claim before the trial court and is making this argument for the first time on appeal. Consequently, we review Mota's *Brady* violation claim for plain error. *United States v. Daniel*, 576 F.3d 772, 774 (7th Cir. 2009). That means that "the alleged *Brady* violation must be an obvious error that affected [Mota's] substantial rights and created 'a substantial risk of convicting an innocent person.'" *Id.* (quoting *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005)).

A *Brady* violation occurs when the prosecution suppresses evidence favorable to the defense and the evidence was material to an issue at trial. *Id.* Here, Agent Aponte's conversation with Ponce exculpating Mota and identifying "Teflon" as the drug source constitutes evidence favorable to Mota.  Although the government prosecutors themselves had no knowledge of Agent Aponte's interview before trial, "[p]rosecutors may not simply claim ignorance of *Brady* material." *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999). Instead, prosecutors have "a duty to learn of any favorable evidence

known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This means that a prosecutor's failure to disclose "evidence possessed exclusively by those actors assisting him in investigating and trying his case" may create a *Brady* violation. *Fields v. Wharrie*, 672 F.3d 505, 513 (7th Cir. 2012). Thus, it is certainly inexcusable that Agent Aponte failed to record and report the substance of his conversation with Ponce and that the prosecution failed to learn of and notify the defense of this evidence. It is a serious violation of the government's duty to turn over all evidence favorable to the accused—a duty required by our nation's standards of justice. *See Brady*, 373 U.S. at 87-88.

But even so, "a violation of this duty, whether intentional or inadvertent, entitles the defendant to a new trial only if the failure to disclose the evidence resulted in denial of a fair trial." *United States v. Banks*, 546 F.3d 507, 509-10 (7th Cir. 2008). And this happens "only when the suppressed evidence is material, meaning when there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 510 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In this case, Mota cannot demonstrate that the suppression of the evidence resulted in the denial of a fair trial. First, it is important to note that Mota learned of Ponce's conversation with Agent Aponte at the start of his trial. Accordingly, Mota and his counsel were aware of this information during the trial and were able

to present this evidence to the jury—and they did so. During the defense's case, Mota's counsel called Ponce as a witness and elicited from Ponce his testimony claiming Mota's innocence and Teflon's involvement in the drug deal; Ponce also testified that he had told Agent Aponte this exculpatory information during an earlier interview which Agent Aponte had failed to record and report. Furthermore, Mota's counsel was able to cross-examine Agent Aponte on this issue. Because the defense was able to present all of this evidence to the jury for its consideration, we cannot say that the prosecution's failure to turn over the evidence to the defense at an earlier time created a reasonable probability that the trial proceedings would have been different. *See Banks*, 546 F.3d at 510. And under the lower standard for plain error review, there is even less reason for us to conclude that the error was obvious and created a substantial risk of convicting an innocent person. *See Daniel*, 576 F.3d at 774.

In response, Mota argues that the last-minute revelation of Ponce's exculpatory statement gave him insufficient time to conduct an investigation into Teflon's identity—and perhaps even to locate him—and that this was prejudicial to his case. But we have said that "when a defendant realizes that exculpatory evidence has been withheld, the 'appropriate course' is to seek a continuance if 'more time to investigate the exculpatory potential of the evidence' is needed." *United States v. Kimoto*, 588 F.3d 464, 488 (7th Cir. 2009) (quoting *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001)). Here, Mota never sought a continuance from the trial.

Moreover, under *Brady*, "'disclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material.'" *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (quoting *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996)). As discussed above, Mota made effective use of the exculpatory evidence in presenting his case to the jury, and if his counsel needed more time, a request for a continuance was the proper course of action. *See Higgins*, 75 F.3d at 335.

Finally, Mota also argues that he suffered prejudice because Ponce's and Agent Aponte's accounts of their conversation differed. In particular, Ponce testified that he identified Teflon as his drug supplier during the conversation, while Agent Aponte testified that this identification did not happen and that he was not aware of the name "Teflon." Mota argues that if Agent Aponte had prepared a written report of the conversation on the day the conversation happened, Mota could have used this report to impeach Agent Aponte on the stand. Though Agent Aponte's failure to prepare a written report following his interview with Ponce is indefensible, this failure does not create a *Brady* violation by itself. At the very least, there must be some prejudice that makes us question the outcome of the jury proceedings. *See Banks*, 546 F.3d at 509-10. But because Mota's counsel was able to cross-examine Agent Aponte on the differences between his account and that of Ponce, we find no such prejudice. Mota cannot demonstrate that there is a *Brady* violation entitling him to a new trial.

B. Sufficiency of the Evidence

Mota's second argument on appeal is that there was insufficient evidence presented at trial to prove beyond a reasonable doubt that he attempted to distribute cocaine. The parties dispute whether Mota challenged the sufficiency of the evidence before the trial court, and, accordingly, whether a de novo or a plain error standard is the proper standard of review. We need not resolve this dispute, however, because even under the more stringent de novo standard, Mota's challenge fails.

When evaluating a defendant's sufficiency-of-the-evidence claim, we view the evidence "in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011) (internal quotation omitted). "We will overturn the jury's verdict only if the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003) (internal quotation omitted).

Here, there is more than sufficient evidence from which a rational juror could have found beyond a reasonable doubt that Mota intended to distribute one kilogram of cocaine at Ponce's house, and that he attempted to do so. First, the prosecution presented Contreras's testimony regarding the drug deal, complete with the

allegations that Mota participated in the negotiations and guaranteed the quality of the cocaine. A rational juror could have found Contreras credible and thus believed his account of the events—and that determination alone is sufficient to support Mota's conviction. In addition, the audio recording and its English transcript corroborated Contreras's account of the events and was more evidence that Mota participated in the drug deal. Finally, there were Ponce's telephone records indicating that Ponce would call Mota immediately after speaking with Contreras about the details of the drug deal—evidence from which a rational juror could have inferred Mota's involvement in the crime.

It would also be reasonable for a rational juror to question Ponce's version of the events. Besides Ponce's testimony, there was apparently no other corroborating evidence of Teflon's existence, such as his phone number in Ponce's telephone records. Also, it would be unusual to close a drug deal in the same room as an innocent and uninvolved third party. And it would be a little odd for the drug source Teflon to drop off $29,000 worth of cocaine at Ponce's house with an unknown home repairman present, and leave before completing the deal without his anticipated cash payment.

In short, when considering the evidence in the light most favorable to the prosecution and making all reasonable inferences in its favor, there is sufficient evidence from which the jury could have found beyond a reasonable doubt that Mota was guilty of the charges against him.

### III.

Because Mota cannot show that he is entitled to a new trial due to a *Brady* violation and because he cannot show that there is insufficient evidence to support his conviction, the judgment of the district court is AFFIRMED.